NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2017 VT 10

No. 2016-231

In re G.G.

Supreme Court

On Appeal from
Superior Court, Washington Unit,
Family Division

November Term, 2016

Timothy B. Tomasi, J.

G.G., Pro Se, Berlin, Appellant.

Rebecca T. Plummer, Vermont Legal Aid, Inc., Montpelier, for Appellant.

William H. Sorrell, Attorney General, Bridget C. Asay, Solicitor General, and
  Benjamin D. Battles, Assistant Attorney General, Montpelier, for Appellee State.

PRESENT: Reiber, C.J., Dooley, Robinson and Eaton, JJ., and Morris, Supr. J. (Ret.),
    Specially Assigned

¶ 1.    **EATON, J.**    At the center of this appeal is the issue of whether mental health patients have a due process right to waive counsel and represent themselves in proceedings on continued treatment or involuntary medication. The patient in this case, G.G., appeals from the court's denial of requests by him and his counsel to let him represent himself in his mental-health proceedings and from the court's subsequent orders of continued treatment and involuntary medication. We hold that the Due Process Clause of the Fourteenth Amendment precludes G.G. from proceeding without representation in his involuntary medication and involuntary commitment hearings, given the State's exceedingly strong interest in an accurate determination

on the merits of those hearings. Accordingly, we affirm the trial court's denial of G.G.'s motion to waive counsel and his attorney's motion to withdraw. Additionally, we affirm the decisions on the merits of G.G.'s continued treatment and involuntary medication orders.

¶ 2. G.G., the appellant, has been hospitalized at the Vermont Psychiatric Care Hospital (VPCH) since September 18, 2015, and has been subject to a sequence of renewed orders for involuntary medication since December 2015. On May 24, 2016, the State filed an application for G.G.'s continued treatment and hospitalization. On June 1, 2016, in light of the pending expiration of a ninety-day involuntary medication order dated March 4, 2016, the State filed an application seeking to involuntarily medicate G.G. with twenty milligrams of Prolixin Decanoate (Prolixin) by intramuscular injection every two weeks.[1] The family court consolidated the State's applications for continued treatment and involuntary medication and scheduled a hearing on June 8, 2016.

¶ 3. Prior to the hearing, G.G. filed a motion seeking to dismiss his attorney and proceed pro se, and his attorney simultaneously filed a motion to withdraw. The court informed G.G. of his right to counsel and "of the value of counsel in this highly technical arena" and "engaged in a colloquy similar to that employed in criminal cases to determine the propriety of [G.G.'s desired] waiver." Noting the "lack of controlling Vermont precedent" and taking account of another Vermont family court decision it called "persuasive," the court found that G.G.'s proffered waiver "was not knowing, intelligent and voluntary; and that [self-representation] was not in [G.G.'s] best interest." Additionally, because G.G. requested to represent himself shortly before the scheduled hearing, the court found that granting the request would have delayed the proceedings. The court therefore denied G.G.'s motion for self-representation and his attorney's motion to withdraw.

---

[1] The March 4, 2016 involuntary medication order gave the State leave to inject G.G. with 12.5 mg of Prolixin every two weeks. G.G. does not appeal the decision to increase the dosage, and we do not address the basis for that decision here.

2

Nevertheless, the court permitted G.G. to participate in cross-examination of the State's witnesses after his attorney concluded her examinations and allowed G.G. to make closing arguments.

¶ 4.    Only two witnesses testified at the merits hearing: G.G. and his treating psychiatrist at the VPCH, Dr. Alisson Richards.  The court adopted Dr. Richards's testimony as "fully credible" and found the following facts, based on her testimony, by the clear-and-convincing-evidence standard.  G.G. has been diagnosed with "substantial mental illness—specifically, schizophrenia." The symptoms of his illness include catatonia, sensitivity to physical contact, difficulty engaging with others, unilateral and rigid views that are not based in reality, and violent reactions to normal social situations.  Because of his illness, G.G. has repeatedly been the subject of involuntary hospitalization orders, some of which followed "violent criminal behavior."  G.G. "has little insight into his condition, does not accept that he had catatonia, does not believe any of his past hospitalizations were appropriate, and does not believe his condition has improved since his arrival at the VPCH."

¶ 5.    The court found that G.G.'s schizophrenia significantly impaired his capacity to exercise self-control, judgment, or discretion in the conduct of his affairs and social relations and that he therefore represented a danger and a potential danger to others.  The court credited Dr. Richards's testimony regarding her own fear of G.G., the "great lengths" to which she went in avoiding areas of disagreement during therapy, and her opinion that G.G.'s illness caused him "to view reality in a distorted manner and to react with violence."  For example, G.G admitted to a situation in which a VPCH nurse encouraged him to engage in more eye contact and he responded by grabbing her and slapping her face because, he later explained to Dr. Richards, "the nurse wanted physical contact, and she got it."  Prior to his admission at the VPCH, G.G. acquired a machete, a stun gun, and pepper spray and told Dr. Richards that he was angry when his parents took those articles from him.  The court also found that if G.G. were discharged, he would soon become a danger to himself, in part because he was refusing to take Prolixin, which controlled his

3

malignant catatonia. Specifically, G.G.'s past catatonic episodes left him unable to speak or walk for hours at a time, causing muscle degeneration and rendering him incapable of caring for himself, and after one episode, G.G. suffered hypothermia from self-exposure to the elements.

¶ 6. Despite the danger that catatonia poses to G.G.'s wellbeing, he has been adamant that he does not wish to take Prolixin because he "does not believe he needs it for any condition, does not believe it has improved his condition, [and] does not like how it makes him feel." Instead, G.G. has made it clear to Dr. Richards that he would, if released, take other medications that he has stockpiled but that have failed to control his symptoms in the past and resulted in his present hospitalization. He maintains that he will not take Prolixin if not subject to court order and has actively attempted to interfere with its administration at the VPCH. When the VPCH began using injectable Prolixin, G.G. squeezed his arm so hard that the nurse was unable to administer the shot effectively, and when he was taking daily oral doses of Prolixin, the administration of the medication caused him and the staff great anxiety and stress. Although Dr. Richards did not ask G.G. directly whether he would voluntarily take Prolixin while at the hospital, the court credited her opinion that she did not need to ask in light of G.G.'s "long-held antipathy to Prolixin and his clear plan to cease its use once released and free of court compulsion." Thus, the court concluded, G.G. would represent a danger to himself if discharged because of the risk that he would discontinue his medication and again suffer the effects of malignant catatonia.

¶ 7. Additionally, the court found that G.G. lacks insight into his own illness and is not competent to decide whether to take medication. G.G. denied having malignant catatonia and denied that any of his physical ailments were related to his mental illness. The court credited Dr. Richards's testimony that "[G.G.]'s condition causes a distorted view of reality that skews his perception as to his condition and the need for appropriate medication," and renders him "unable to balance the need for medication against the possible risks." The court considered those potential risks—which include tardive dyskinesia, tremors, muscle rigidity, seizures, in rare cases

4

neuroleptic malignant syndrome (NMS), and pain with injection—relative to the benefits of continued administration of Prolixin, and concluded that the benefits to G.G. outweighed the potential risks. Specifically, the court found that since being subjected to forced medication orders in December 2015, G.G. has improved significantly and that Prolixin has been the cause of his improved mental condition, but without Prolixin G.G.'s prognosis was not good and his condition would worsen. The court credited Prolixin with helping G.G. "emerge[] from his catatonic state" and begin to engage in social activities like Scrabble and karaoke and found that if G.G. remains on Prolixin, his symptoms may be managed and he may eventually be able to return to the community in a supervised setting. The court found that the alternative drugs that G.G. preferred were ineffective and that the risk of G.G. suffering Prolixin's most severe side effects could be mitigated and the less severe side effects effectively managed. Thus, the court concluded, there was no alternative effective treatment to Prolixin, and given G.G.'s inability to balance the benefits of Prolixin against its risks, he was not competent to decide whether to take the medication.

¶ 8. Based on these findings, the court determined that G.G. was "a patient in need of further treatment" under 18 V.S.A. § 7101(16)(A) and (B) and concluded that there was no less restrictive alternative than to hospitalize G.G. First, the court reasoned, "[G.G.] has little insight into his condition and would not voluntarily take the medication that has resulted in his improved condition." Second, "[G.G.] requires significant staff supervision to ensure that his violent proclivities are contained and controlled." Third, the court considered alternative placement for G.G.—specifically, the Middlesex Therapeutic Community Residence—but found that G.G. does not wish to go there. On the other hand, the court found that "[t]he VPCH provides appropriate services to treat [G.G.]'s condition. It can ensure that [he] is offered treatment in a safe environment and that he has ready access to necessary support services. The hospital can offer him medications, group and individual counselling, and activities, all in a secure environment." Thus, the court granted the State's application for continued treatment and hospitalization for a

5

period of one year. The court also granted the State's application for involuntary medication and issued an order requiring G.G. to submit to bimonthly administrations of Prolixin, subject to weekly reviews. In reaching that conclusion, the court first determined that G.G. was a patient being held by the State under an order of hospitalization, that he was refusing medication, and that he was not competent to decide whether to take the medication and then applied the seven statutory factors from 18 V.S.A. § 7627. G.G. appeals.[2]

---

[2] Because G.G.'s appeal to this Court included an appeal from the family court's denial of G.G.'s request to represent himself, this Court permitted both G.G. and his appointed counsel to submit briefs and participate in oral argument. Thus, for the purposes of this decision, we treat G.G.'s arguments and those of his attorney as having been made by a single representative on behalf of G.G. Additionally, in the brief that he filed with this Court, G.G. argues that he is entitled to a trial by jury. We decline to reach that issue because G.G. waived the issue by failing to raise it until the end of the hearing below. Even if we were to address this argument, however, G.G. would not have been entitled to a trial by jury because the Seventh Amendment civil jury clause has not been incorporated to apply to the states, and neither the Vermont Constitution nor the common law grant litigants in mental health proceedings a right to a trial by jury. See Vt. Const. ch. II, § 38, cl. 1; State v. Irving Oil Co., 2008 VT 42, ¶ 5, 183 Vt. 386, 955 A.2d 1098; 18 V.S.A. §§ 7612, 7612a, 7624, 7625, 7627 (placing responsibility for conducting hearings and making findings on patient or proposed patient's circumstances in "the Court"). Under the Vermont Constitution, there is no right to a civil jury trial in any proceeding that was "unknown at common law." Shaw v. Vt. Dist. Ct., Unit No. 3, Franklin Cir., 152 Vt. 1, 6, 563 A.2d 636, 640 (1989). Mental health proceedings in Vermont are provided for by statute in Title 18, and as other courts have noted, a civil detention hearing "whatever else it is, plainly is not a suit at common law." United States v. Perry, 788 F.2d 100, 117 (3d Cir. 1986); see also In re Jones, 339 So. 2d 1117, 1118 (Fla. 1976) (interpreting Florida's constitution in light of state law in existence prior to adoption of state constitution and concluding that because there was no jury right for commitment proceeding preconstitution, there is no modern right to jury trial for commitment proceeding); In re Mills, 585 P.2d 1143, 1144 (Or. 1978) (interpreting Oregon's constitution and concluding that because state law provided no right to jury trial for commitment proceeding at time state constitution was adopted, there is no modern right to jury trial for commitment proceeding). Additionally, in 1797, only four years after the State of Vermont adopted its first constitution as an independent state, the Legislature passed a law governing treatment of the mentally ill that provided:

> That the several judges of probate within their respective districts, shall have power from time to time, (upon request made by the friends or relations of any idiot, non-compos, or lunatic, or distracted person, or upon the application of any respectable freeholder of the town in which such idiot, non-compos, or lunatic, or distracted person lives, or is an inhabitant,) to direct the selectmen and civil authority of such town, to make inquisition thereinto; and if the person said to be non-compos, an idiot, lunatic or distracted

## I. Right to Self-Representation

¶ 9.    We treat G.G.'s argument that he should be permitted to represent himself at the mental-health proceedings as one grounded in procedural due process. His assertion that he has a right to a specific form of process—the right to represent himself—requires him to first show that he has a protected liberty interest in not being committed to a mental-health facility and in not being administered medication against his will. Accordingly, we begin our analysis by considering the Fourteenth Amendment's Due Process Clause and its requirement that states provide process prior to curtailing protected liberty interests. Next, to understand what process, if any, is due a mental health patient in an involuntary confinement or involuntary medication proceeding, we look to Sixth Amendment[3] precedent involving the right of a criminal defendant to waive counsel to understand the rationales that undergird recognizing that right and what application those rationales might have in the context of a mental health proceeding.[4]

<div style="margin-left: 2em;">

person, shall be adjudged <u>by the selectmen and civil authority aforesaid (or the major part of them)</u> to be incapable of taking care of him or herself, and shall certify the same under their hands, to the judge of probate; the said judge is hereby empowered to appoint some suitable person or persons, to be guardian or guardians. . . .

</div>

1808 V.S. ch. 40, No. 1, § 1 (March 2, 1797) (emphasis added). We quote the language from the 1797 statute because the wording of the statute is relevant; we intend no disrespect in using this language. See <u>In re Guardianship of A.S.</u>, 2012 VT 70, ¶ 2 n.1, 192 Vt. 631, 57 A.3d 716 (mem.) (noting that quoted language was repeated from prior version of statute and was not intended to be disrespectful). The fact that the statutory law that displaced the common law of 1793 provided for adjudication of mental illness by the courts—not by a jury—furthers what other states and the federal courts have recognized: the common law did not recognize a right to a jury trial in civil commitment proceedings, and no such right exists now.

[3] The Sixth Amendment to the U.S. Constitution is made applicable to the states, including Vermont, through the Fourteenth Amendment. See <u>State v. Paquette</u>, 146 Vt. 1, 4, n.3, 497 A.2d 358, 361, n.3 (1985) (citing <u>Pointer v. Texas</u>, 380 U.S. 400, 406 (1965)).

[4] The State argues that because G.G. and his attorney filed their motions only a day or two before the scheduled hearing, "[t]he risk of delay alone is a sufficient basis to affirm the family court's decision." This argument is unavailing. The right that G.G. attempts to exercise is a constitutional right, and, as is true for a criminal defendant asserting his or her Sixth Amendment right to self-representation, an attempt to claim that right is timely if invoked before trial. Cf. <u>State</u>

¶ 10.    In general, there is no right to counsel—and therefore no concurrent right to waive counsel—in civil proceedings.  See Turner v. Rogers, 564 U.S. 431, 441-42 (2011).  However, as the U. S. Supreme Court has recognized, the Fourteenth Amendment's Due Process Clause requires that states provide indigent litigants with appointed counsel "when, if [the litigant] loses, he [or she] may be deprived of his [or her] physical liberty."  Id. at 442-43.  Preventing the arbitrary or undeserved imposition of such a restriction on physical liberty "has always been at the core of the liberty protected by the Due Process Clause."  Foucha v. Louisiana, 504 U.S. 71, 80 (1992); see also O'Connor v. Donaldson, 422 U.S. 563, 575 (1975) (explaining that there is no constitutional basis for confining mentally ill person "if [that person is] dangerous to no one and can live safely in freedom"); G.T. v. Stone, 159 Vt. 607, 611, 622 A.2d 491, 493 (1992) (holding that "liberty interest at stake in involuntary commitment proceeding is as valuable an interest as liberty interest at stake in criminal proceeding").  And where involuntary treatment is accompanied by compelled medication, the concerns about liberty are heightened because "[a]mong the historic liberties protected by the Due Process Clause is the right to be free from, and to obtain judicial relief for, unjustified intrusions on personal security."  Vitek v. Jones, 445 U.S. 480, 492 (1980)

_____

v. Bean, 171 Vt. 290, 297, 762 A.2d 1259, 1264 (2000) (noting that "[m]ost courts have held that the right to self-representation must be invoked before trial to be considered timely per se").  If the party attempting to assert the right to self-representation raises the issue before trial, the invocation is timely per se.  Id.  The sole case that the State cites in support of its argument, In re A.B., 2013 VT 66, ¶¶ 9-11, 194 Vt. 279, 79 A.3d 42, involved an untimely effort to assert a right of self-representation in a termination-of-parental-rights hearings.  The mother whose rights were at issue attempted to dismiss her appointed counsel after the termination hearing had begun.  Id. ¶ 12.  The family court therefore appropriately considered "the potential for disruption and delay."  Id. ¶ 10. This Court, in affirming the family court on appeal, emphasized that the impact of delay is heightened in the juvenile context because the parent's right to self-representation must be weighed against a child's right to a prompt custody determination.  Id. ¶ 11.  The State's reliance on In re A.B. is therefore misplaced for two reasons.  First, G.G.'s attempt to assert a right to self-representation was timely.  Second, even if G.G.'s motion had been untimely, the risk of delay and prejudice on the facts of this case were not heightened, as the State claims.  This is because although the involuntary medication order to which G.G. was subject expired on May 31, 2016, the medication was effective for two weeks after its administration.  Thus, even if the family court had delayed the hearing by several days to permit G.G. to prepare, G.G. would not have necessarily been unmedicated.

8

(quotation omitted). We therefore affirm, consistent with longstanding precedent, that due process applies to mental-health patients in proceedings that could result in involuntary commitment or treatment. See id. at 491-92 ("We have recognized that for the ordinary citizen, commitment to a mental hospital produces a massive curtailment of liberty, and in consequence requires due process protection." (quotations omitted)); Addington v. Texas, 441 U.S. 418, 428, 431-33 (1979) (holding that due process requires, prior to civil commitment, that states prove necessity for treatment by clear and convincing evidence and observing that "an erroneous commitment is sometimes as undesirable as an erroneous conviction"); O'Connor, 422 U.S. 563, 575-76 (rejecting argument that state has constitutional basis to confine mental-health patient who is dangerous to nobody); In re Gault, 387 U.S. 1, 36-41 (1967) (recognizing that due process requires appointment of counsel in delinquency proceedings); In re G.K., 147 Vt. 174, 179, 514 A.2d 1031, 1034 (1986) (holding that indefinite orders of non-hospitalization without regular judicial review violate due process); In re E.T., 2004 VT 111, ¶ 7, 177 Vt. 405, 865 A.2d 416 (describing "the Vermont Constitution's presumption that freedom from restraint is a fundamental, inalienable right"); see also Bell v. Wayne Cty. Gen. Hosp., 384 F. Supp. 1085, 1093 (E.D. Mich. 1974) ("[W]e hold that a respondent has the right to legal counsel [in civil commitment proceedings] and, if indigent, to appointed counsel, to assist him [or her] at every step of the commitment proceedings; and further that he must be notified of this right at the outset of the proceedings.").

¶ 11. "[O]nce it is determined due process applies, the question remains what process is due." Morrissey v. Brewer, 408 U.S. 471, 481 (1972); see also Washington v. Harper, 494 U.S. 210, 228 (1990) ("Having determined that state law recognizes a liberty interest, also protected by the Due Process Clause, which permits refusal of antipsychotic drugs unless certain preconditions are met, we address next what procedural protections are necessary to ensure that the decision to medicate an inmate against his will is neither arbitrary nor erroneous. . . ."). Thus, to answer the question that is before this Court—whether a mental health patient has the right to waive

9

representation in a proceeding that implicates due process—we must look to the three factors that guide any procedural due process inquiry: (i) the interests of the individual; (ii) the governmental interest affected; and (iii) the risk of erroneous deprivation of the individual's interests if the right he or she asserts is not recognized, and the probable value, if any, of recognizing that right. Mathews v. Eldridge, 424 U.S. 319, 335 (1976). We address each Mathews factor in turn.

## A. The Interests of the Individual

¶ 12. G.G. argues that he should have been allowed to represent himself because, as he explained in his briefing, he "didn't want an attorney to be in charge of [his] case." His argument captures his asserted interests in representing himself, which relate to "the inestimable worth of free choice," Faretta v. California, 422 U.S. 807, 834 (1975), "respect for the individual," id. at 834 (citation omitted), and protecting his desire "to affirm [his] dignity and autonomy," McKaskle v. Wiggins, 465 U.S. 168, 176-77 (1984).

¶ 13. Those values parallel the values at stake in a criminal trial, where the "Sixth and Fourteenth Amendments include a constitutional 'right to proceed without counsel when' a criminal defendant 'voluntarily and intelligently elects to do so.' " Indiana v. Edwards, 554 U.S. 164, 170 (2008) (quoting Faretta, 422 U.S. at 807). The U.S. Supreme Court's "foundational" self-representation case, Faretta, implied the right to self-representation from:

> (1) a "nearly universal conviction," made manifest in state law, that "forcing a lawyer upon an unwilling defendant is contrary to his [or her] basic right to defend himself [or herself] if he [or she] truly wants to do so"; (2) Sixth Amendment language granting rights to the "accused"; (3) Sixth Amendment structure indicating that the rights it sets forth, related to the "fair administration of American justice," are "persona[l]" to the accused; (4) the absence of historical examples of forced representation; and (5) "respect for the individual."

Edwards, 554 U.S. at 170-71 (quoting Faretta, 422 U.S. at 817-34) (final alteration in original). Thus, while we recognize that the Fourteenth Amendment and not the Sixth Amendment governs

10

the scope of G.G.'s rights because his case is a civil, not criminal, proceeding, the Faretta factors[5] guide our understanding of the weight that ought to be afforded to G.G.'s interest in self-representation in the context of an involuntary commitment or medication proceeding.

¶ 14.    Looking first to state law interpretations of the right to self-representation in the civil commitment and involuntary medication context, we note that there is far from a "nearly universal conviction," Faretta, 422 U.S. at 817, in state law that mental-health patients have a right to proceed without representation.  Compare In re Conservatorship of Joel E., 33 Cal. Rptr. 3d 704, 711 (Ct. App. 2005) (finding no right to self-representation in civil commitment proceeding where "individual's ability to make judgments about his own welfare is in question" because "a fair proceeding demands legal representation"), and In re Penelope W., 2009 ME 81, ¶ 9, 977 A.2d 380 (interpreting state statute governing mental health proceedings, which provided that "[t]he person must be afforded an opportunity to be represented by counsel, and, if neither the person nor others provide counsel, the court shall appoint counsel for the person," as foreclosing mental health patient from self-representation), and In re Irwin, 529 N.W.2d 366, 371 (Minn. Ct. App. 1995) (finding no statutory right to proceed pro se), with In re D.Y., 95 A.3d 157, 169-71 (N.J. 2014) (interpreting state statute governing civil commitment proceedings as permitting self-representation), and In re J.S., 159 P.3d 435, 440 (Wash. Ct. App. 2007) (finding right to self-representation in civil commitment proceedings and applying "unequivocal, intelligent, and knowing" standard to waiver), and In re S.Y., 469 N.W.2d 836, 840 (Wis. 1991) (locating right to self-representation in state constitutional provision granting any citizen right to "prosecute or defend his suit either in his [or her] own proper person or by an attorney of the suitor's choice").  This fact is relevant because when the U.S. Supreme Court has looked to the underlying

---

    [5]  Since Faretta, when the U.S. Supreme Court has considered whether a right to self-representation exists, it has looked to the Faretta factors for guidance.  See, e.g., Martinez v. Ct. of App. of Cal., 528 U.S. 152, 164 (2000) (applying Faretta to appellate self-representation and concluding that there is no right to self-representation on appeal).

11

motivations for recognizing a right to counsel in other contexts, it has given weight to the existence of a state-level consensus in favor of recognizing such a right. See Faretta, 422 U.S. at 817 (quoting Justice Jackson for idea that "[t]he mere fact that a path is a beaten one is a persuasive reason for following it" (quoting R. Jackson, Full Faith and Credit—The Lawyer's Clause of the Constitution, 45 Col. L. Rev. 1, 26 (1945)). The lack of a national consensus among state courts about recognizing a right to waive counsel in civil commitment and involuntary medication proceedings, thus, is an indication that recognizing a right to waive in those proceedings would not further the same fundamental interests as in the criminal context. See id.

¶ 15. Moreover, the Faretta Court, looking to the language and structure of the Sixth Amendment, concluded that it "grants to the accused personally the right to make his defense" and "the right to self-representation—to make one's own defense personally—is thus necessarily implied by the structure of the Amendment." Id. at 819. However, the right to self-representation, even in a criminal trial, is not absolute: "the Constitution permits judges to take realistic account of the particular defendant's mental capacities by asking whether a defendant who seeks to conduct his own defense at trial is mentally competent to do so." Edwards, 554 U.S. at 177-78; see also State v. Burke, 2012 VT 50, ¶ 27, 192 Vt. 99, 54 A.3d 500 (discussing Edwards and Faretta). In reaching that conclusion, the Edwards Court gave particular weight to its view that "a right of self-representation at trial will not 'affirm the dignity' of a defendant who lacks the mental capacity to conduct his defense without the assistance of counsel." Edwards, 554 U.S. at 176 (quoting McKaskle, 465 U.S. at 176-77, for proposition that " '[d]ignity' and 'autonomy' of individual underlie self-representation right"). "To the contrary, given that defendant's uncertain mental state, the spectacle that could well result from his self-representation at trial is at least as likely to prove humiliating as ennobling." Id. Therefore, even in the criminal context, the Sixth Amendment right to counsel is not absolute, and the limitations that exist for a criminal defendant

12

whose liberty is at stake carry an even greater weight for a mental health litigant like G.G. whose liberty and bodily integrity are at stake.

¶ 16. Comparing the Sixth Amendment[6]—the source of the right to counsel and the right to waive counsel in criminal cases—and procedural due process[7]—the source of the right to counsel in civil cases—highlights why there is no right to waive counsel in a mental-health proceeding like those in which G.G. seeks to waive counsel. The Sixth Amendment is unique in that it guarantees rights to the accused personally, indicating that its overarching purpose is to "be an aid to a willing defendant—not an organ of the State interposed between an unwilling defendant and his [or her] right to defend him[ or her]self personally." Faretta, 422 U.S. at 820. In other words, the Sixth Amendment right to waive counsel stems from that amendment's concern with the autonomy interests of the individual. See id. Procedural due process, on the other hand, is "flexible" and its overarching purpose is to ensure that there exists adequate process to protect substantive rights. See Morrissey, 408 U.S. at 481. Thus, as the U.S. Supreme Court has concluded, the Sixth Amendment's focus on the rights of the specific individual to whom its protections extend supports the right to waive counsel when the Sixth Amendment is implicated. See Faretta, 422 U.S. at 819. In contrast, the Due Process Clause's broader concern for adequate procedure does not implicate the same dignity and autonomy considerations, and the interest that G.G. asserts when he seeks to dismiss his appointed attorney finds no support in the structure of the Due Process Clause.

---

[6] The Sixth Amendment provides, in relevant part: "In all criminal prosecutions, the accused shall . . . have the Assistance of Counsel for his defence." U.S. Const. amend. VI (emphasis added).

[7] Article 10 of the Vermont Constitution states: "nor can any person be justly deprived of his liberty, except by the laws of the land, or the judgment of his peers." Vt. Const. ch. I, art. 10. This Court has interpreted that language as being "synonymous with 'due process of law.' " State v. Messier, 145 Vt. 622, 627, 497 A.2d 740, 743 (1985).

¶ 17.   Additionally, while it is true that a patient like G.G., who is the subject of an involuntary medication or commitment proceeding, retains an interest in preserving his or her dignity and autonomy, that interest is tempered by the fact that the patient's competency has been called into question.[8]  As is true of a mentally ill criminal defendant, a mentally ill patient who engages in self-representation at a civil hearing runs the risk of undermining his or her dignity and autonomy by presenting the case ineffectively as a result of the underlying mental illness.  See Edwards, 554 U.S. at 176 (citing American Psychiatric Association amicus brief filed in support of neither party in that case for proposition that "[d]isorganized thinking, deficits in sustaining attention and concentration, impaired expressive abilities, anxiety, and other common symptoms of severe mental illness can impair the defendant's ability to play the significantly expanded role required for self-representation").  Thus, while we recognize that individuals like G.G. undoubtedly have an interest in affirming their dignity and autonomy by representing themselves, we also recognize that "given [their] uncertain mental state[s], the spectacle that could result from [their] self-representation [at the family court] is at least as likely to prove humiliating as ennobling."  Id.  G.G.'s interest in self-representation in these mental-health proceedings, then, is a limited interest.

B.  The Governmental Interest Affected

_____

[8]  The statutes that control involuntary medication and treatment proceedings apply only to patients who have already been examined by a licensed physician and have been found to be in need of treatment.  18 V.S.A. §§ 7612(e) (involuntary treatment), 7624(c) (involuntary medication).  The statute defines "a person in need of treatment" as an individual with a mental illness and who, "as a result of that mental illness," has such a limited "capacity to exercise self-control, judgment, or discretion in the conduct of his or her affairs and social relations" that "he or she poses a danger of harm to himself, to herself, or to others."  Id. § 7101(17).  By law, then, any individual who is the subject of mental-health proceedings like those at issue in this case—concerning continued treatment and involuntary medication—has already been determined by a licensed physician to have a mental illness that severely impacts his or her self-control, judgment, or discretion.  Id.  Thus, although we limit this decision to the proceedings that are at issue here, we note that the process required in these proceedings may extend to other mental-health proceedings that require a preliminary finding of mental illness by a licensed physician.

14

¶ 18. The State's interests in precluding mental health patients from representing themselves in involuntary commitment and involuntary treatment proceedings are manifold. First and foremost, the State has an "a concomitant, constitutionally essential interest in assuring that the [patient's hearing] is a fair one." Sell v. United States, 539 U.S. 166, 180 (2003). This is especially true in the case of involuntary medication, where " '[a] compelled surgical intrusion into an individual's body . . . implicates expectations of privacy and security' of great magnitude," and where the patient "cannot undo [the] harm" of involuntary medication, even if he or she is adjudicated competent to refuse. Id. at 176-77 (quoting Winston v. Lee, 470 U.S. 753, 759 (1985)). The State has no recognized interest in injecting therapeutic medication into the bloodstream of a patient who is competent to refuse the medication, and the State's interest in not allowing mental-health patients to proceed unrepresented flows directly from that fact: the State has a strong interest in not exercising the most profound governmental power—the power to invade the body of a citizen—when that exercise of power is unwarranted. See 18 V.S.A. § 7629(b) (explaining Legislature's intention to enact involuntary medication laws in accordance with principle that involuntary medication "should be avoided whenever possible because the distress and insult to human dignity that results from compelling a person to participate in medical treatment against his or her will are real"); In re L.A., 2008 VT 5, ¶ 16, 183 Vt. 168, 945 A.2d 356 [hereinafter In re L.A. II] ("The Legislature expressed deep concern over coerced medication and wanted procedures in place to assure that it was done only when necessary."); cf. Edwards, 554 U.S. at 176-77 ("Moreover, insofar as a defendant's lack of capacity threatens an improper conviction or sentence, self-representation in that exceptional context undercuts the most basic of the Constitution's criminal law objectives, providing a fair trial."); In re Conservatorship of Joel E., 33 Cal. Rptr. 3d at 710 ("[A]ffording an individual the right of self-representation generally does little if anything to further the fairness or accuracy of the proceedings.").

¶ 19.    Similarly, the Vermont statutes that govern procedures for continued treatment and involuntary medication hearings provide that the patient "shall be afforded counsel." 18 V.S.A. §§ 7613 (appointment of counsel), 7621 (incorporating § 7613 for continued treatment proceedings), 7625 (incorporating § 7613 for involuntary medication). The Legislature's choice of the word "shall" is a further expression of the State's interest in requiring patients in these hearings to be represented by counsel. See Town of Victory v. State, 174 Vt. 539, 544-45, 814 A.2d 369, 376 (2002) (mem.) (explaining that word "shall" in statute is "mandatory language," not "directory" language). In fact, at least one state with statutory language similar to Vermont's has interpreted the words "shall appoint counsel" as requiring representation by counsel. In re Penelope W., 2009 ME 81, ¶¶ 9-10, 977 A.2d at 380. In reaching that conclusion, the Supreme Judicial Court of Maine reasoned that the statute's "explicit requirement" that mental-health patients be represented was "grounded on sound public policy." Id. ¶ 10. Specifically, the court considered that "involuntary commitment hearings inevitably involve substantial questions regarding the mental status of the person who is the subject of the application" and self-representation "runs the risk of giving those who may be incompetent the task of proving their own competence." Id. We find the Maine court's reasoning in the context of our constitutional analysis persuasive: when the Legislature has evinced an intention to make a statutory provision mandatory, and where that intention is grounded in sound public policy, the State has a strong interest in seeing the policy carried out.

¶ 20.    The State also has an interest in avoiding outcomes in mental-health proceedings that undermine the integrity of the process. Specifically, self-representation in an involuntary medication or commitment hearing creates a circularity problem: a mental health patient who represents him or herself and who is adjudicated in need of commitment or medication would then be in a position to challenge the initial waiver of counsel as not knowing, intelligent or voluntary and thereby claiming a right to a new hearing with counsel. See, e.g., In re B.S., No. 32-2-06,

Wymh, slip op., at 4 (Vt. Super. Ct. Mar. 27, 2006) (finding no right to self-representation and reasoning that "if [B.S.] proceeds pro se, [and] if he is subsequently found to be a person in need of treatment he will then have grounds for arguing that he could not waive counsel due to his mental state, thereby invalidating the court's ruling and requiring a new hearing <u>with</u> counsel"); In re R.Z., 415 N.W.2d 486, 488 (N.D. 1987) (reversing commitment order and remanding to trial court for new competency hearing because patient alleged that initial waiver was not knowing and intelligent); In re Mental Commitment of Aaron J., No. 03-3349, 2004 WL 2249951, at *4 (Wis. Ct. App. Oct. 7, 2004) ("Even if a subject gave the 'right' answers to the court's questions during a colloquy, the subject could plausibly later maintain that he or she was not thinking clearly at the time. . . ."). The lack of finality that is threatened by a continuous review of a mental-health patient's competency to waive counsel also implicates other government interests, including expedient resolution of cases of this nature, economic efficiency, and the maintenance of an effective and uninterrupted treatment plan for the patient. Thus, the State's interest in requiring that patients like G.G. be represented by counsel is significant.

C. Risk of Erroneous Outcomes if the Asserted Right Is Not Recognized

¶ 21. Finally, we must consider the risk that a patient will be erroneously subjected to involuntary commitment or medication if he or she is not permitted to proceed pro se. See Mathews, 424 U.S. at 321. "Numerous courts have commented that, in most cases, the right of self-representation is the equivalent of a right to a poor defense." In re Conservatorship of Joel E., 33 Cal. Rptr. 3d at 710 (citing Faretta, 422 U.S. at 834); see also Martinez, 528 U.S. at 161 ("No one, including Martinez and the Faretta majority, attempts to argue that as a rule pro se representation is wise, desirable, or efficient."). This is because, as a rule, "it is reasonable to assume that counsel's performance is more effective than what the unskilled [litigant] could have provided for himself [or herself]." Martinez, 528 U.S. at 161. As the California Supreme Court has noted, "[i]t is manifest" from the language of Faretta that the rule announced in that case was

17

not intended "to enhance the reliability of the truth-determining or fact-finding process" and self-representation "will most likely have the directly opposite effect." People v. McDaniel, 545 P.2d 843, 849 (Cal. 1976). We agree. Rather than enhancing the fairness or accuracy of a proceeding, allowing a mental-health patient to represent him or herself runs the risk of undermining the accuracy of the proceeding. This factor, too, weighs against permitting self-representation in an involuntary commitment or medication hearing.

¶ 22. Taken together, the three Mathews factors compel us to hold that the Fourteenth Amendment's Due Process Clause precludes a patient in a continued treatment or involuntary medication hearing, or in an appeal concerning those issues, from representing him or herself. See Martinez, 528 U.S. at 160-61. To the extent that this conclusion is inconsistent with In re E.T, 2008 VT 48, 184 Vt. 273, 959 A.2d 544, or In re L.G., No. 91-488, slip op. at 2 (Vt. Jan. 7, 1992) (unpub. mem.), those cases are overruled.

¶ 23. However, a patient who is the subject of one of these proceedings is not prevented from participating in preparing and presenting his or her case. First, Vermont Rule of Professional Conduct 1.14 provides that "[w]hen a client's capacity to make adequately considered decisions in connection with a representation is diminished, whether because of minority, mental impairment or for some other reason, the lawyer shall, as far as reasonably possible, maintain a normal client-lawyer relationship with the client." V.R.P.C. 1.14(a). Other rules of professional conduct in Vermont define the nature of "a normal client-lawyer relationship." See V.R.P.C. 1.2 ("[A] lawyer shall abide by a client's decisions concerning the objectives of representation and, as required by Rule 1.4, shall consult with the client as to the means by which they are to be pursued."); V.R.P.C. 1.4(a) ("A lawyer shall . . . reasonably consult with the client about the means by which the client's objectives are to be accomplished; keep the client reasonably informed about the status of the matter; [and] promptly comply with reasonable requests for information."). We highlight these rules to emphasize that even when an attorney represents a client with diminished capacity, he or

she has an ethical duty to "treat the client with attention and respect. Even if the person has a legal representative, the lawyer should as far as possible accord the represented person the status of client, particularly in maintaining communication." See V.R.P.C. 1.14 cmt. 2.

¶ 24. Second, in Vermont the patient has a statutory right "to appear at the hearing to testify." 18 V.S.A. § 7615(d); see also id. §§ 7621 (directing court to apply procedures set forth in §§ 7613-7616 in hearing for continued treatment), 7625 (directing court to apply procedures set forth in §§ 7613, 7614, 7616, and 7615(b)-(e) in hearing for involuntary medication). Even a patient who is incompetent may not, as a matter of Vermont law, be precluded from presenting the court with his or her perspective, from explaining why he or she should not be subjected to orders for treatment or involuntary medication, or from providing the court with any additional information that might aid in the resolution of the State's application for an order.

¶ 25. Third, in recognition "that the right to speak for oneself entails more than the opportunity to add one's voice to a cacophony of others," we hold that a judge should allow additional participation by the patient when the court determines that it is appropriate under the circumstances. See McKaskle, 465 U.S. at 177. This may involve the kind of participation in which the court below permitted G.G. to be involved, including conducting limited cross-examination of witnesses and making closing objections or a closing statement. However, the judge must ensure an orderly and fair proceeding consistent with due process and the appropriate level of patient participation therefore depends on the circumstances of each case; there may be times where any level of participation would be disruptive to the integrity of the hearing process, and in those instances the judge may determine that no level of patient participation, beyond the opportunity to testify, is appropriate. Fundamentally, the level of patient participation allowed by the judge in any case must strike an appropriate balance between recognizing the patient's significant dignity and autonomy interests, see id., at 176-77, and the State's interest in ensuring the accuracy of the fact-finding process. See Sell, 539 U.S. at 180.

## II. Refusal, Competency, and the Merits of Involuntary Medication

¶ 26. G.G. appeals the family court's findings that he is in need of further treatment and that the State satisfied its burden for his continued hospitalization and involuntary medication. Specifically, G.G. challenges two aspects of the involuntary medication order. First, he argues that the State did not present sufficient evidence that he was refusing psychiatric medication, a prerequisite to the application of the involuntary medication statute. 18 V.S.A. § 7624(a). Second, he argues that the court applied an incorrect standard for competency and that under the correct standard, he was competent to make decisions about his course of treatment.

¶ 27. In judicial proceedings involving involuntary mental-health treatment and commitment, the State must prove its case by clear and convincing evidence. 18 V.S.A. § 7625(b). "Clear and convincing evidence is a very demanding standard, requiring somewhat less than evidence beyond a reasonable doubt, but more than a preponderance of the evidence." In re E.T., 2004 VT 111, ¶ 12, 177 Vt. 405, 865 A.2d 416. However, on appeal "our review of the family court's decision is deferential" and is "based on all the evidence presented at the hearing." In re M.C., 2005 VT 60, ¶ 4, 178 Vt. 585, 878 A.2d 284 (mem.). "The test on review is not whether this Court is persuaded that there was clear and convincing evidence, but whether the factfinder could reasonably have concluded that the required factual predicate was highly probable." In re N.H., 168 Vt. 508, 512-13, 724 A.2d 467, 470 (1998).

### A. Patient in Need of Further Treatment Determination[9]

¶ 28. A "patient in need of further treatment" is defined in 18 V.S.A. § 7101(16) as either "a person in need of treatment" or as "a patient who is receiving adequate treatment, and who, if such treatment is discontinued, presents a substantial probability that in the near future his or her

---

[9] G.G., not his appointed counsel, raised this argument in his briefs to this Court. As discussed above, supra, note 2, we reach this issue because G.G. was permitted to participate alongside his attorney before this Court.

20

condition will deteriorate and he or she will become a person in need of treatment." "A person in need of treatment," in turn, is defined in 18 V.S.A. § 7101(17) as "a person who has a mental illness and, as a result of that mental illness, his or her capacity to exercise self-control, judgment, or discretion in the conduct of his or her affairs and social relations is so lessened that he or she poses a danger of harm to himself, to herself, or to others." The State may show a "danger of harm to others" by establishing that the individual at issue "has inflicted or attempted to inflict bodily harm on another" or that by his or her "threats or actions he or she has placed others in reasonable fear of physical harm to themselves." Id. § 7101(17)(A)(i), (ii). The State may show a "danger of harm to himself or herself" by establishing that the individual at issue "is unable, without supervision and the assistance of others, to satisfy his or her need for nourishment, personal or medical care, shelter or self-protection and safety," to an extent that "death, substantial physical bodily injury, serious mental deterioration, or serious physical debilitation or disease will ensue unless adequate treatment is afforded." Id. § 7101(17)(B)(ii). The court's inquiry into dangerousness need not be focused purely on present danger; the statutory scheme recognizes that with effective treatment a patient may not be currently dangerous and thus focuses on "predictions about the effect of discontinuing treatment, rather than dangerousness." In re P.S., 167 Vt. 63, 71, 702 A.2d 98, 103 (1997). Upon making a determination that a patient is in need of further treatment, the court may enter an involuntary treatment order only after examining appropriate alternatives "to ensure that the patient receives treatment in the least restrictive manner." In re R.L., 163 Vt. 168, 172-73, 657 A.2d 180, 183-84, (1995) (citing 18 V.S.A. § 7617(c)).

¶ 29. Here, the State presented sufficient evidence for the trial court to conclude that G.G. was a patient in need of further treatment, either as a "person in need of treatment" pursuant to § 7101(16)(A), or as a patient who, if treatment is discontinued, poses a substantial probability of becoming a "person in need of treatment" pursuant to § 7101(16)(B). Dr. Richards testified that G.G. suffers from "substantial mental illness—specifically, schizophrenia"—and that in the past

21

he has suffered from catatonia as a result of his mental illness. G.G.'s symptoms include an inability to speak or walk for hours of a time, sensitivity to physical contact, difficulty engaging with others, unilateral and rigid views that are not based in reality, and violent reactions to normal social stimuli. Because of G.G.'s illness, he has "a long history of involuntary hospitalizations, some of which followed on the heels of violent criminal behavior." With respect to the danger G.G. poses to others, Dr. Richards "credibly testified as to her own fear of [G.G.]" and "that [G.G.]'s condition can cause him to view reality in a distorted manner and to react with violence," as exemplified by an incident at the VPCH in which G.G. grabbed a nurse and slapped her in the face in response to a normal social interaction. Prior to his admission at the VPCH, G.G. also "acquired a machete, a stun gun, and pepper spray," and told Dr. Richards that he was "upset that his parents had taken those articles from him."

¶ 30. With respect to the danger that G.G. poses to himself, the court credited Dr. Richards's testimony that G.G. was presently refusing to take Proxlin and found that it was "likely" that, if released, he would discontinue his course of medication, that his condition would deteriorate, and that he would become a danger to himself "in short order." As an example of how he might become a danger to himself, the court described an incident in which G.G., prior to his admission at the VPCH, suffered a catatonic episode that left him with hypothermia as a result of exposure to the elements. Dr. Richards testified that catatonia "can be life-threatening in and of itself when not treated" and that in her opinion, "[G.G.'s] life is at risk" if he is not medicated. The court credited her testimony that G.G.'s catatonia caused muscle degeneration and that G.G. has "consistently been clear" that he would not take Prolixin if released and would instead "take other medications that he had stockpiled," which Dr. Richards explained "had failed in the past."

¶ 31. Although G.G. disputes that he has a mental illness, there is sufficient evidence in the record to support the court's conclusion that G.G. suffers from schizophrenia. Specifically, the court had before it evidence that G.G. has had at least fifteen hospitalizations since March

22

2006, that prior to his current hospitalization he was diagnosed with childhood-onset schizophrenia, and that he ended up in the VPCH because of dangerous and violent behavior that required his admission to the emergency room. Dr. Richards testified at the hearing that she had been G.G.'s treating psychiatrist since his admission at the VPCH in September 2015, and she explained that she has been meeting with G.G. on a regular basis since that time, that she is familiar with G.G.'s medical history, and that she has consulted with multiple colleagues in the medical profession, outpatient providers, and G.G.'s family members regarding his illness. Dr. Richards's medical opinion, to a reasonable degree of certainty, was that "G.G. has schizophrenia." She explained that she had never "met anyone with such a rigid perspective before," described how when G.G. arrived at the hospital his "ability to function" was severely impaired, and testified to her opinion that G.G. suffered from auditory hallucinations. Thus, given that there was ample evidence that G.G. suffered a mental illness, the question before this Court is whether the family court could reasonably have concluded that, "as a result of that mental illness," it was highly probable that his "capacity to exercise self-control, judgment, or discretion in the conduct of his . . . affairs and social relations is so lessened that he . . . poses a danger of harm to himself . . . or to others." 18 V.S.A. § 7101(17).

¶ 32.    In arguing that this standard could not be satisfied by the evidence in the record, G.G.[10] challenges Dr. Richards's credibility and urges this Court to conclude that her testimony was "irrational" and that her credibility "repeatedly remains in doubt." However, "[w]e rely on the factfinder's assessment of the credibility of the witnesses and weighing of the evidence" and it is therefore not for this Court to reassess Dr. Richards's credibility. See In re N.H., 168 Vt. at 512, 724 A.2d at 470. Instead, we must look at the evidence in the record, including Dr. Richards's testimony, and decide whether the court could have reasonably found that G.G. was a patient in

---

[10]   Again, G.G., not his appointed counsel, raised this argument. See supra, note 2.

need of further treatment. See In re T.C., 2007 VT 115, ¶¶ 25-26, 182 Vt. 467, 940 A.2d 706. We hold that the evidence and the testimony from Dr. Richards—that G.G. is prone to violent behavior both when he is on and off of his prescribed course of medication, that he is likely to suffer malignant catatonia if he discontinues Prolixin, and that he was likely to discontinue his course of medication if released—are sufficient to support the court's determination that G.G. was a patient in need of further treatment.

¶ 33.    Additionally, the court considered a less restrictive alternative placement for G.G. at the Middlesex Therapeutic Community Residence, but it found—based on Dr. Richards's testimony at the hearing—that "[G.G.] does not wish to go there" and concluded that "[t]he VPCH provides appropriate services to treat [G.G.]'s condition. It can ensure that [he] is offered treatment in a safe environment and that he has ready access to necessary support services. The hospital can offer him medications, group and individual counselling, and activities, all in a secure environment." Additionally, the court credited Dr. Richards's opinion that "there is no less restrictive alternative to hospitalization." Based on the evidence in the record, we cannot conclude that the court erred in determining that there was no alternative, less restrictive placement for G.G. other than at the VPCH. See In re R.L., 163 Vt. at 173, 657 A.2d at 183-84. Accordingly, we affirm the trial court's decision to grant the State's application for a year-long hospitalization order.

B.  Involuntary Medication Order

¶ 34.    Under 18 V.S.A. § 7624(b)(1), the State may file a petition with the family court for the involuntary medication of a patient who refuses to accept medication if the patient is, among other things, subject to an order of hospitalization pursuant to 18 V.S.A. § 7619. In a hearing in which the State seeks to involuntarily medicate a patient subject to an order of hospitalization, the State bears the burden of proving by clear and convincing evidence that: (1) the patient is refusing medication; (2) the patient is not competent to refuse; and (3) based on the factors outlined in

24

§ 7627(c), involuntary medication is warranted. See In re L.A., 2006 VT 118, ¶¶ 8, 11, 181 Vt. 34, 912 A.2d 977 [hereinafter In re L.A. I].

¶ 35. As a threshold matter, G.G. argues that there was insufficient evidence to support the court's finding that he was currently refusing medication. The involuntary medication statute provides that the State may seek to involuntarily medicate a patient who is the subject of a hospitalization order only if the patient "is refusing to accept psychiatric medication." 18 V.S.A. § 7624(a). Although G.G. admits that "he had previously stated his opposition to receiving [Prolixin]" and that he "had stated his intention to stop taking [Prolixin] and take a different medication should he be discharged," he argues that there was insufficient evidence of refusal because "he had not stated or been asked about his willingness to receive [Prolixin injections] in the hospital on a voluntary basis at or near the time of the application for involuntary medication." We review the court's factual finding that G.G. was refusing medication by asking whether there was sufficient evidence for the factfinder to have reasonably concluded, with a high probability, that G.G. was refusing medication. See In re N.H., 168 Vt. at 512-13, 724 A.2d at 470.

¶ 36. The evidence adduced at the hearing included the following. Dr. Richards testified that "G.G. has been very clear from before the first court order that he does not believe in taking [an antipsychotic]" and that he had never "expressed any kind of willingness to take the medication" she prescribed him. When the State's counsel asked Dr. Richards whether she had asked G.G. directly if he would take Prolixin in the hospital, she testified that she did not need to because "it's been so clear . . . that he does not want to take it, . . . [s]o, I guess I haven't thought to go ahead and say, what about tomorrow." Dr. Richards testified that the hospital had shifted to intravenous medication because G.G. had a history of "not taking medications and then storing them and then overdosing even in the hospital on those medications." She described an incident after the hospital began administering intravenous medication to G.G. in which he "squeezed his arm so hard that the nurse was unable to administer the shot effectively." And although Dr.

25

Richards agreed that at G.G.'s most recent injection prior to the hearing, G.G. "came to the treatment room without hesitation" and "was very cooperative," she also explained that "whenever it's a day for an injection, there's a lot of anxiety . . . so [] it's always very planned out how it's going to happen." Significantly, the State's attorney declined to seek an order for involuntary medication for the medication used to control the side effects of Prolixin because, as Dr. Richards explained, "G.G. has been willing to take medications on his own for the side effects." Finally, although the State bears the burden of establishing refusal, G.G. testified at the hearing and had the opportunity to put in the record a willingness to take Prolixin while in the hospital, but he did not avail himself of that opportunity, even after hearing testimony from Dr. Richards about her belief that G.G. was refusing Prolixin. To the contrary, in the briefings G.G. submitted to this Court, he explained that the "episode of violence" in which he admitted to slapping a nurse was triggered by her "making very real threats" to administer "continued amounts of a horrid medication" and denied that he supports his attorney's argument that he is not refusing medication.

¶ 37. Thus, although G.G. is correct that the involuntary medication statute requires that a patient "be refusing psychiatric medication" and G.G. is also correct that we must read the statute in light of the Legislature's express intent "to work towards a mental health system that does not require coercion or the use of involuntary medication," 18 V.S.A. § 7629(c), that does not equate to a requirement that the State obtain an express intention to presently refuse medication each time the medication is administered. The standard that the family court must apply is clear and convincing evidence, and circumstantial evidence of refusal is adequate evidence in involuntary medication hearings. That is not to suggest, however, that a past refusal, without more, is always sufficient to establish present refusal; prior to ordering involuntary medication, the court must still satisfy itself to a high degree of probability that the patient is presently refusing to take the medication. See In re N.H., 168 Vt. at 512-13, 724 A.2d at 470. As the court below observed, "it would have been advisable" for Dr. Richards or for the State's attorney to ask G.G. "the direct

26

question, either before or during the hearing," and we agree that it is better practice in involuntary medication hearings to directly ask the patient, in reasonable proximity to the hearing, if he or she is refusing medication. However, we agree with the court that the State's failure to ask the "direct question" is not fatal to its request for involuntary treatment because there was ample circumstantial evidence adduced at the hearing by which the court below could have reasonably concluded, with a high degree of probability, that G.G. was presently refusing Prolixin.

¶ 38. G.G. also argues that the court applied the incorrect standard in determining that he was not competent to refuse medication. According to G.G., "[t]he trial court's analysis commits the same errors as the decision overturned by this Court in In re L.A. I, 2006 VT 118." Specifically, G.G. contends that the court "did not correctly apply the competency standard required by the involuntary medication statute" and "failed to consider relevant evidence in this determination of [G.G.]'s competency to refuse medication."

¶ 39. In determining whether a person is competent to make a decision about a proposed course of medical treatment, the court must determine "whether the person is able to make a decision and appreciate the consequences of that decision." 18 V.S.A. § 7625(c). As we explained in In re L.A. I, this inquiry "is focused entirely on the patient's decision-making ability." 2006 VT 118, ¶ 9. "The standard is different, and more difficult for the Commissioner to meet, from the standard for determining whether a person may be involuntarily committed" because the competency inquiry involves more than "the fact of the patient's diagnosis alone, or the merits of the psychiatrist's medical advice," or else the existence of mental illness would "preclude the need for a petition altogether." Id. ¶ 10. Thus, "[t]he fact that medication might benefit [the patient]— as is generally expected of medication—cannot be enough to conclude that the patient is incompetent." Id. ¶ 12. "As long as [a] patient can understand the consequences of refusing medication, the statute permits him [or her] to do so, even if refusing medication will be to his [or her] detriment." Id.

27

¶ 40. The evidence shows that the court applied the correct standard for competency and made sufficient findings, based on the evidence in the record, regarding whether G.G. understood the consequences of refusing medication. See In re I.G., 2016 VT 95, ¶ 14, __ Vt. __; __ A.3d __; In re L.A. I, 2006 VT 118, ¶ 17 (reversing and remanding for new hearing because "[t]he court made no specific findings" about patient's appreciation of risks and benefits of medication (emphasis added)). The court found that G.G. was "unable to balance the need for medication against the possible risks" and that his "condition causes a distorted view of reality that skews his perception as to his condition and the need for appropriate medication." In particular, the court found that G.G. does not understand the consequences of not being medicated with Prolixin: (1) he does not believe that he should take antipsychotic medication because he claims that "[t]here is no evidence provided that [he] exhibited a mental illness"; (2) he denies that prior to being medicated with Prolixin he suffered from malignant catatonia and developed hypothermia as a result; (3) he does not acknowledge that prior to taking Prolixin he was "essentially mute, with very poor hygiene, no eye contact, withdrawn and unable to communicate effectively with others in any meaningful way," and instead claims that "I think I would have remembered this if it occurred"; and (4) he has no capacity to recognize that his current and past hospitalizations have been the result of his mental illness nor that when he is "having a psychotic episode . . . he's not able to process his own safety." The court concluded that G.G.'s insistence that he is not ill is a product of his mental illness and reasoned that his inability to recognize and appreciate the danger that his symptoms present rendered him incompetent to make a reasoned decision about whether Prolixin is a reasonable form of treatment for his illness. See In re I.G., 2016 VT 95, ¶ 14.

¶ 41. The court acknowledged that G.G. was capable of describing in an intelligent and eloquent manner the potential side effects of Prolixin, but found that he nevertheless was unable to appreciate the gravity of the risk that not taking Prolixin presented in light of its demonstrated benefits for him. The court correctly recognized that eloquence and competence are not

28

interchangeable concepts; a person may be eloquent and yet incompetent. Specifically, the court took into account Prolixin's known side effects and G.G.'s concerns about "seizures, muscular rigidity, and NMS because there is a connection between NMS and malignant catatonia" but credited Dr. Richards's testimony that the "benefits of the medication outweigh the risks" and that "Prolixin has been the cause of [G.G.'s] improved mental condition." Thus, unlike the court in In re L.A. I, the court here made specific findings about the risks and benefits that Prolixin poses for G.G., compared those risks and benefits to G.G.'s beliefs about Prolixin, and found credible, based on that comparison, Dr. Richards's opinion that G.G. was not competent to decide whether to take Prolixin. See In re I.G., 2016 VT 95, ¶ 16 (citing In re L.A. I, 2006 VT 181, ¶ 5). The court in this case applied the appropriate standard in concluding that G.G. cannot "understand the consequences of refusing medication," based on its consideration of the risks and benefits posed by the proposed medication and in light of G.G.'s own beliefs about those risks and benefits. In re L.A. I, 2006 VT 181, ¶ 12.

¶ 42. Finally, G.G. argues that the merits of the involuntary medication issue, guided by the statutory factors outlined in § 7627, weigh against involuntary medication. Specifically, G.G. contends that "[t]here is not sufficient evidence" to sustain the trial court's finding that he is in need of medication. Again, we apply the familiar standard in reviewing the court's findings: was there sufficient evidence for the factfinder to have reasonably concluded, with a high probability and given its consideration of the statutory factors, that medication was warranted for G.G. See In re N.H., 168 Vt. at 512-13, 724 A.2d at 470.

¶ 43. Section 7627 of the involuntary medication statute directs the court to consider at a minimum, the following seven factors: (1) the patient's competently expressed preferences, 18 V.S.A. § 7627(b) and (d); (2) the patient's religious convictions, id. § 7627(c)(1); (3) the impact of medication or nonmedication on the patient's relationships with his or her family or household members, id. § 7627(c)(2); (4) the "likelihood and severity of possible adverse side effects from

29

the proposed medication," id. § 7267(c)(3); (5) the risks and benefits of the proposed medication and its effect on the patient's prognosis and his or her health and safety, id. § 7267(c)(4); (6) available alternative treatment, id. § 7627(c)(5); and (7) the need, if any, for long-acting medication, id. § 7627(f)(1). We address the court's findings on each of these factors in turn.

¶ 44. The court found that G.G. was not competent to express a view regarding his preference for medication but nevertheless acknowledged his preference not to take antipsychotic medications. Specifically, the court gave weight to G.G.'s dislike for how Prolixin makes him feel, his belief that it has not improved his condition, and his fear of the potential side effects of Prolixin. The court's findings on this factor were based on its conclusion, described above, that G.G. was not competent to make decisions about his own medication, and we affirm that conclusion. Next, the trial court found that G.G.'s aversion to Prolixin is not based on a religious preference and that there was no significant record evidence of any effects of medication or nonmedication on G.G.'s family or household members.

¶ 45. The court then considered the side effects, risks and benefits of Prolixin, and the availability of alternative treatment, again based on Dr. Richards's testimony at the hearing. The court fully credited Dr. Richards's testimony on these points, and because "[w]e rely on the factfinder's assessment of the credibility of the witnesses and weighing of the evidence" it is therefore not for this Court to reassess Dr. Richards's credibility. See In re N.H., 168 Vt. at 512, 724 A.2d at 470. The relevant findings include that: (1) G.G. "has and will continue to benefit greatly from administration of Prolixin"; (2) "he has made significant improvements since the hospital began to give him Prolixin"; (3) on Prolixin G.G.'s "symptoms may be managed and he may be able to return to the community in a supervised setting"; (4) "the VPCH is well aware of the potential side effects" of Prolixin; (5) as of the time of the hearing there was no "evidence of any side effects on [G.G.]"; (6) "Prolixin has been the cause of [G.G.]'s improved mental condition" and without Prolixin, "[G.G.]'s condition is likely to decline; and (7) "alternative drugs

30

that [G.G.] has preferred in the past had not been effective in treating his condition and had resulted in his present hospitalization." These findings were sufficient for a reasonable factfinder to conclude, by clear and convincing evidence, that the benefits of Prolixin for G.G. outweigh the risks and that there is no alternative available treatment. See id.

¶ 46. Finally, the court considered the need for long-acting medication and found that "a long-acting form of Prolixin is warranted in [G.G.]'s case." In making that finding, the court credited Dr. Richards's testimony that G.G. "does not wish to take [Prolixin]" and that "[w]hen daily oral doses were employed, most administrations of the drug resulted in conflicts between staff and [G.G.]" that "caused stress and anxiety for [G.G.] and for staff." The court found, based on Dr. Richards's testimony, that the stress associated with forcibly administering daily oral doses of Prolixin "adversely impacted [G.G.'s] condition," but that G.G. "has made significant progress on the long-acting form of Prolixin." These findings, too, were sufficient for a reasonable factfinder to conclude, by clear and convincing evidence, that for G.G., a long-acting form of Prolixin was necessary. See id.

¶ 47. We hold that the court had before it sufficient evidence from which to conclude that G.G. was refusing medication, that he was not competent to refuse his medication, and that the prescribed medication—long-lasting Prolixin—was warranted for G.G. Additionally, we hold that the court did not apply the wrong standard in evaluating G.G.'s competence to refuse medication. Accordingly, we affirm the court's grant of the State's application for continued treatment and involuntary medication.

Affirmed.

FOR THE COURT:

_____
Associate Justice