FILED

10/03/2017

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 15-0762

DA 15-0762

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2017 MT 244

IN THE MATTER OF:

S.M.,

> Respondent and Appellant.

APPEAL FROM:    District Court of the Twentieth Judicial District,
In and For the County of Lake, Cause No. DI 15-5
Honorable Deborah Kim Christopher, Presiding Judge

COUNSEL OF RECORD:

> For Appellant:
>
> Nick K. Brooke, Smith & Stephens, P.C., Missoula, Montana
>
> For Appellee:
>
> Timothy C. Fox, Montana Attorney General, Tammy A. Hinderman,
> Assistant Attorney General, Helena, Montana
>
> Steven N. Eschenbacher, Lake County Attorney, Polson, Montana

Submitted on Briefs:    July 19, 2017

Decided:    October 3, 2017

Filed:

_____
Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1 The State filed a petition to involuntarily commit S.M. after he told a friend he was going to commit suicide. At the initial hearing, S.M. advised the court that he wished to waive counsel and represent himself. The District Court ultimately denied S.M.'s request and appointed counsel over S.M.'s objection. S.M., together with his appointed counsel, entered into a stipulation for commitment to community-based treatment. The District Court approved the stipulation and ordered S.M.'s commitment. On appeal, S.M. contends that Montana law prohibiting waiver of the right to counsel violates his rights under the United States Constitution. We affirm.

## PROCEDURAL AND FACTUAL BACKGROUND

¶2 In November 2015, S.M. asked a friend to watch his dog because he intended to commit suicide. The friend called 9-1-1. When law enforcement officers arrived at S.M.'s house, they found a noose with a chair below it. S.M. told them he was going to kill himself. The officers brought S.M. to the hospital. At the hospital, S.M. denied that he intended to harm himself, but he told health care providers "that he does have a rope long enough and has been looking for someone to look after his dog when he is gone." S.M. agreed that he needed help but refused any treatment more restrictive than outpatient treatment. Because the medical professional who examined S.M. believed outpatient treatment would be inadequate due to S.M.'s suicidal ideation, the State filed a petition to involuntarily commit S.M. The District Court determined that there was probable cause to proceed with the petition and appointed a public defender to represent S.M.

2

¶3     At the initial hearing on the petition, S.M. requested that the District Court dismiss his appointed counsel because he wished to represent himself.  He stated further that "for the purpose of the record I'd note that I have a right to proceed pro se under Ferrata [sic] versus California and shadow counsel may be appointed, but the attorney will not represent me."  The District Court and the public defender agreed with S.M. that he had "the absolute right" to represent himself.  The District Court then appointed the public defender "to serve only as standby counsel."  The District Court explained to S.M. that appointed counsel was merely "backup" whom S.M. could "use . . . to the extent [S.M.] wish[ed]."

¶4     On November 20, 2015, Erica Weber, a certified mental health professional, examined S.M. and submitted her report to the District Court.  Weber reported that S.M.'s symptoms include "high risk behaviors[,] impulsivity, and suicidal ideation" and that S.M. "remain[ed] a high risk to attempt [suicide] without outside assistance."  She expressed concern that S.M. would not follow through with a voluntary treatment plan if the District Court dismissed the involuntary commitment petition.   Weber recommended court-ordered, community-based treatment.

¶5     On that same day, standby counsel filed a notice with the District Court that, pursuant to § 53-21-119(1), MCA, "[t]he right to counsel may not be waived" in involuntary commitment proceedings. The notice explained that under this Court's decision in *In re N.A.*, 2013 MT 255, ¶ 15, 371 Mont. 531, 309 P.3d 27, standby counsel was insufficient representation.

3

¶6 In response to the notice, the District Court informed S.M. at the next hearing that he could not waive appointed counsel. The District Court told S.M. that the proceeding would continue "in a fashion that doesn't walk all over the top of your ability to represent yourself." S.M. protested that he was "very well aware" of his rights and that he had represented himself in various civil and criminal proceedings in the past, as well as representing other people in the tribal court system. He also agreed that he was in need of mental health intervention.

¶7 When the District Court attempted to grant a recess to give S.M. an opportunity to read Weber's report and to confer with his counsel, S.M. instead requested to meet with both his appointed counsel and the prosecutor, "so that we can get through this and get to the point of the hearing, which is me getting mental health." During the recess, the parties negotiated a stipulation in which they agreed that S.M. suffered from a mental illness and was in need of commitment. They stipulated that the least restrictive treatment alternative was placement in a community outpatient treatment facility. Appointed counsel, the prosecutor, and S.M. all signed the agreement. The District Court approved the stipulation and entered an order of commitment requiring S.M. to comply with the agreed-upon plan of care.

¶8 S.M. appeals the commitment order and facially challenges the prohibition against waiving counsel in civil commitment proceedings contained in § 53-21-119(1), MCA, as a violation of his rights under the Sixth and Fourteenth Amendments to the United States Constitution.

**STANDARDS OF REVIEW**

¶9 Constitutional issues are questions of law; our review of such questions is plenary. *In re Mental Health of T.M.*, 2004 MT 221, ¶ 7, 332 Mont. 394, 96 P.3d 1147.

¶10 Legislative enactments are presumed to be constitutional. *Williams v. Bd. of Cnty. Comm'rs of Missoula Cnty.*, 2013 MT 243, ¶ 23, 371 Mont. 356, 308 P.3d 88. The party challenging a statute has the burden of proving beyond a reasonable doubt that it is unconstitutional. *Williams*, ¶ 23. To prevail on a facial challenge, the party making the challenge must show that "no set of circumstances exists" under which the statute would be valid or that the statute lacks any "plainly legitimate sweep." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449, 128 S. Ct. 1184, 1190 (2008) (citations and internal quotations omitted); *see also Mont. Cannabis Indus. Ass'n v. State*, 2016 MT 44, ¶ 14, 382 Mont. 256, 368 P.3d 1131.

**DISCUSSION**

¶11 *Whether § 53-21-119(1), MCA, prohibiting a person from waiving the right to counsel in a civil commitment proceeding, violates the Sixth and Fourteenth Amendments to the United States Constitution.*

¶12 Montana's civil commitment statutes provide respondents to involuntary commitment petitions with numerous procedural rights. They include the right to notice in advance of any hearing, § 53-21-115(1), MCA; to be present, to offer evidence, and to present witnesses, § 53-21-115(2), MCA; to know in advance the names and addresses of opposing witnesses and to cross-examine them, § 53-21-115(3)-(4), MCA; to remain silent, § 53-21-115(6), MCA; to be examined by the professional of the respondent's choice,

5

§§ 53-21-115(9), -118, MCA; to be dressed in the respondent's own clothes, § 53-21-115(10), MCA; and to either refuse to take or to voluntarily take medication before any hearing, § 53-21-115(11)-(12), MCA. Section 53-21-119(1), MCA, allows a respondent to "mak[e] an intentional and knowing decision" to waive these rights. Along with the above listed rights, the statute guarantees the right to counsel in no fewer than three provisions. *See* § 53-21-115(5), MCA (guaranteeing "the right to be represented by counsel"); § 53-21-116, MCA (guaranteeing the right to counsel at any hearing or trial and providing for appointed counsel); § 53-21-117, MCA (guaranteeing the right to secure an attorney of the respondent's choice). Unlike its treatment of other rights, § 53-21-119(1), MCA, prohibits a respondent from waiving the right to counsel.

¶13 S.M. alleges that the language in § 53-21-119(1), MCA, that "[t]he right to counsel may not be waived" violates his right to represent himself under the Sixth Amendment and his right to substantive due process under the Fourteenth Amendment.[1]

¶14 S.M. argues first that the right to act as counsel for oneself rests on the Sixth Amendment. In *Faretta v. California*, 422 U.S. 806, 819, 95 S. Ct. 2525, 2533 (1975), the United States Supreme Court held that the right to present one's own defense in a criminal prosecution, though not explicitly provided for in the text, was "necessarily implied by the

---

[1] S.M. alludes to the Montana Constitution, which provides greater protection of some rights than the United States Constitution guarantees. *State v. Covington*, 2012 MT 31, ¶ 20, 364 Mont. 118, 272 P.3d 43. A party asserting such greater protection "must establish sound and articulable reasons that the Montana Constitution affords greater protection for a particular right." *Covington*, ¶ 20. Because S.M. failed to provide separate legal analysis regarding any possible greater protections the Montana Constitution affords, the Court declines to decide those issues here.

structure of the [Sixth] Amendment." S.M. argues that the Sixth Amendment's right to self-representation applies equally to involuntary civil commitment proceedings.

¶15 The State counters, and we agree, that the Sixth Amendment of the United States Constitution does not apply to civil commitment proceedings. By its very language the Sixth Amendment is limited to "criminal prosecutions." U.S. Const. amend. VI; *see Martinez v. Court of Appeal of Cal.*, 528 U.S. 152, 159-60, 120 S. Ct. 684, 690 (2000) ("The Sixth Amendment identifies the basic rights that the accused shall enjoy in 'all criminal prosecutions.' They are presented strictly as rights that are available in preparation for trial and at the trial itself."); *Middendorf v. Henry*, 435 U.S. 25, 37, 96 S. Ct. 1281, 1289 (1976) ("[T]hat a proceeding will result in loss of liberty does not ipso facto mean that the proceeding is a 'criminal prosecution' for purposes of the Sixth Amendment."). We have explained that "although affording an individual with certain 'criminal' due process rights, the involuntary commitment process does not invoke" the Sixth Amendment. *In re Mental Health of K.G.F.*, 2001 MT 140, ¶ 39, 306 Mont. 1, 29 P.3d 485. Although we overruled *In re K.G.F.* on other grounds in *In re J.S.*, 2017 MT 214, ¶ 19, 388 Mont. 397, ___ P.3d ___, we reaffirmed the principle "that the right to effective assistance of counsel in civil commitment proceedings is premised upon the Fourteenth Amendment to the federal Constitution" and companion State constitutional provisions, not upon the Sixth Amendment. *In re J.S.*, ¶ 15. Because civil commitment constitutes "a significant deprivation of liberty that requires due process protection," *Addington v. Texas*, 441 U.S. 418, 425, 99 S. Ct. 1804, 1809 (1979), a constitutional right

7

to self-representation in civil commitment proceedings, if any exists, must be found in the Fourteenth Amendment Due Process Clause of the United States Constitution, not in the Sixth Amendment.

¶16    S.M. argues that § 53-21-119(1), MCA, also violates his substantive due process rights under the Fourteenth Amendment.  S.M contends that the Fourteenth Amendment Due Process Clause protects his right to represent himself in involuntary civil commitment proceedings because such a right is "deeply rooted in this Nation's history."  *Washington v. Glucksberg*, 521 U.S. 702, 721, 117 S. Ct. 2258, 2268 (1997) (quoting *Moore v. City of East Cleveland*, 431 U.S. 494, 503, 97 S. Ct. 1932, 1938 (1977)).  Such fundamental rights may not be infringed "*at all*, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest."  *Glucksberg*, 521 U.S. at 721, 117 S. Ct. at 2268 (quoting *Reno v. Flores*, 507 U.S. 292, 302, 113 S. Ct. 1439, 1447 (1993)); *see also Newville v. Dep't of Fam. Servs.*, 267 Mont. 237, 249, 883 P.2d 793, 800 (1994) ("[T]he due process clause contains a substantive component which bars arbitrary governmental actions regardless of the procedures used to implement them, and serves as a check on oppressive governmental action.").

¶17    Analyzing substantive due process claims under the federal Constitution is a two-step process.  First, we must determine whether the Due Process Clause protects a purported right as a fundamental right.  *Glucksberg*, 521 U.S. at 720-21, 117 S. Ct. at 2268.  In making this determination, we look to see if the right is "objectively deeply rooted in the Nation's history and tradition, and implicit in the concept of ordered liberty, such that

8

neither liberty nor justice would exist if they were sacrificed." *Glucksberg*, 521 U.S. at 720-21, 117 S. Ct. at 2268 (citations and internal quotations omitted). Critical to this inquiry is a "careful description of the asserted fundamental liberty interest." *Glucksberg*, 521 U.S. at 721, 117 S. Ct. at 2268 (citations and internal quotations omitted). The second step depends on the outcome of the first step. If the purported right is fundamental, any governmental restriction must pass strict judicial scrutiny. *Glucksberg*, 521 U.S. at 721, 117 S. Ct. at 2268. If the purported right is not fundamental, rational basis review applies. *Glucksberg*, 521 U.S. at 728, 117 S. Ct. at 2271.

¶18    In making the initial determination as to whether a fundamental right is at stake, we must carefully define the purported right in a way that "avoids over generalization in the historical inquiry." *Hawkins v. Freeman*, 195 F.3d 732, 747 (4th Cir. 1999) (citing *Glucksberg*, 521 U.S. at 722-23, 117 S. Ct. at 2268-69). A "careful description" of the purported right S.M. asserts is the right to represent oneself in a civil commitment proceeding.

¶19    We next turn to whether such a right is "found to be deeply rooted in our legal tradition." *Glucksberg*, 521 U.S. at 722, 117 S. Ct. at 2268. Unlike the right to self-representation that the Sixth Amendment guarantees to criminal defendants, there is far from a "nearly universal conviction," *Faretta*, 422 U.S. at 817, 95 S. Ct. at 2532, that persons in involuntary civil commitment proceedings have a right to represent themselves. The right to waive counsel in civil commitment proceedings "varies among the states from allowing self-representation as in other suits, to giving the court discretion as to whether

waiver and self-representation should proceed, to making the presence of counsel unwaivable." 53 Am. Jur. 2d *Mentally Impaired Persons* § 35 (2017) (footnotes omitted). Decisions from various jurisdictions illustrate the different policy choices that states have made on this issue. *Compare Conservatorship of Joel E.*, 132 Cal. App. 4th 429, 440 (2005) (holding that neither the state statute nor the United States Constitution provided a right to self-representation in civil commitment proceedings); *In re Penelope W.*, 19 A.3d 813, 815 (Me. 2011) (noting that in criminal cases self-representation "is a limited right" and that the Maine statute's requirement for representation by counsel in civil commitment proceedings "does not violate a patient's constitutional rights"); *In re Irwin*, 529 N.W.2d 366, 371 (Minn. 1995) (stating that the Minnesota statute does not give a person in civil commitment proceedings a right to self-representation); *and In re G.G.*, 165 A.3d 1075, 1091 (Vt. 2017) (holding "that the Fourteenth Amendment's Due Process Clause precludes a patient in a continued treatment or involuntary medication hearing, or in an appeal concerning those issues, from representing him or herself"), *with In re Jesse M.*, 170 P.3d 683, 686 (Ariz. 2007) (holding "that the intended beneficiary of a statute may waive its benefit"); *In re Civil Commitment of D.Y.*, 95 A.3d 157, 161, 171 n.7 (N.J. 2014) (declining to reach the constitutional question and determining, based on statutory text and a tradition of self-representation, that a party may waive representation in a civil commitment proceeding under New Jersey's Sexually Violent Predator Act without reaching whether it would hold the same for other civil commitment proceedings); *In re R.Z.*, 45 N.W.2d 486, 488 (N.D. 1987) (stating that North Dakota relies on criminal cases "to define the rights of

respondents in mental health proceedings" and that a respondent may waive counsel if the waiver is "knowing and intelligent and voluntary"); *In re Det. of J.S.*, 159 P.3d 435, 440 (Wash. Ct. App. 2007) (holding that the right to self-representation was protected by the constitution of the State of Washington and interpreting the statute to not require counsel); *and In re S.Y.*, 469 N.W.2d 836, 840 (Wis. 1991) (concluding that the right to self-representation in civil commitment proceedings is protected by the constitution of the State of Wisconsin). This disparate case law shows that there is no universal agreement among the states whether a person in a civil commitment proceeding has the right to proceed pro se.

¶20 S.M. cites two cases in support of his argument that self-representation in civil commitment proceedings has a long history in the United States. Neither case discusses involuntary civil commitment proceedings specifically. The first case on which S.M. relies addresses the history of self-representation in civil cases generally, not civil commitment proceedings specifically, and states that the right is protected "simply by statute" and not by the Constitution. *Iannaccone v. Law*, 142 F.3d 553, 556 (2d Cir. 1998). The second case pertains to the control and guardianship of the property of an elderly farmer. *In re Vanauken*, 10 N.J. Eq. 186 (1854). Although S.M. quotes the line, "[t]he alleged lunatic has a right . . . to make his defence [sic] by himself or counsel," Vanauken was in fact represented by counsel. 10 N.J. Eq. at 190. The case does not analyze any right to proceed without that representation. We do not find either of these cases convincing as establishing

11

a long history in the United States of a right to self-representation in civil commitment proceedings.

¶21 To the contrary, as the State points out, formal proceedings for involuntary civil commitment are relatively modern developments. Early American statutes dealing with mental illness during the Colonial era primarily were concerned with the guardianship and control of any assets the person may have had. 1 Michael L. Perlin, *Mental Disability Law: Civil and Criminal* § 2A-2.1b, 53 (2d ed. 1998) (hereafter Perlin, *Mental Disability Law*). During this time, very few facilities existed for those with mental illness, and commitment into these institutions was viewed "strictly as administrative," with an application from "the local overseer of the poor" or a family member generally sufficient to commit an individual. 1 Perlin, *Mental Disability Law* § 2A-2.1b, 54.

¶22 Between 1810 and 1840 institutions to house the mentally disabled proliferated, and a "cult of asylum" swept across the United States. Alan Dershowitz, *The Origins of Preventative Confinement in Anglo-American Law Part II: The American Experience*, 43 U. Cin. L. Rev. 781, 804-05 (1974) (internal quotations omitted) (hereafter Dershowitz, *The Origins of Preventative Confinement*). During this time, involuntary commitment involved little more than a certification from a medical professional that commitment was proper. 1 Perlin, *Mental Disability Law* § 2A-2.1b, 54; Samuel Jan Brakel et al., *The Mentally Disabled and the Law* 14 (3d ed. 1985).

¶23 In the years after the Civil War, courts and legislatures concerned about abuse in these informal systems "promulgated safeguards designed to prevent confinement of

persons who were sane." Dershowitz, *The Origins of Preventive Confinement* 845. Many states during this time instituted procedural reforms, such as requiring trial by jury, presence of the patient at judicial hearings, right to appeal, and "reasonable opportunity to correspond with friends." Dershowitz, *The Origins of Preventative Confinement* 842.

¶24 Since the 1890s, reform efforts "have gone through repeated cycles driven primarily by whether the public at the time is (1) concerned that people with mental illness are not getting the treatment they need or (2) focused on the possibility of unjust detention." Paul S. Appelbaum, *A History of Civil Commitment and Related Reforms in the United States: Lessons for Today*, 25 Dev. Mental Health L. 13, 17 (2006). Pertinent to our purpose today, this history tells us that self-representation in civil commitment proceedings has not been protected since the beginning of the Nation. In fact, strong procedural safeguards to protect the interests of those facing involuntary civil commitment are a rather recent development and have focused on improving the fairness and accuracy of the process.

¶25 The history tells us further that the process afforded to respondents in civil commitment proceedings is the subject of a "considered legislative response," and we should be cautious to extend constitutional protections that "place the matter outside the arena of public debate and legislative action." *Dist. Attorney's Office v. Osborne*, 557 U.S. 52, 73, 129 S. Ct. 2308, 2322 (2009) (plurality opinion) (quoting *Glucksberg*, 521 U.S. at 720, 117 S. Ct. at 2268). Unlike the penal purpose of criminal law, a primary purpose of the civil commitment statutes in Montana is to "secure for each person who may be suffering from a mental disorder and requiring commitment the care and treatment suited

13

to the needs of the person and to ensure that the care and treatment are skillfully and humanely administered with full respect for the person's dignity and personal integrity." Section 53-21-101(1), MCA. A companion purpose is to "ensure that due process of law is accorded" to any person in civil commitment proceedings. Section 53-21-101(4), MCA. To further that purpose, the statutes are replete with process requirements. This Court requires strict adherence to all process due in these proceedings. *See, e.g., In re J.S.*, ¶ 18. Civil commitment proceedings operate on an expedited time frame, § 53-21-122(2)(a), MCA, (hearing on the petition must be within five days of initial appearance), and the respondent may not be detained in a jail or other correctional facility pending commitment, § 53-21-124(4), MCA. In order to initiate an involuntary civil commitment proceeding, the court first must find probable cause based on evidence contained in the State's petition that the person is suffering from a mental disorder "that has substantial adverse effects on an individual's cognitive or volitional functions." Section 53-21-102(9)(a), MCA (definition of "mental disorder"); § 53-21-121(c), MCA (requiring the petition to contain facts supporting the allegation of mental disorder); § 53-21-122(2)(a), MCA (requiring the judge to dismiss the petition if no probable cause is found). The statutes are designed to protect a respondent's civil and legal rights, as well as the safety of the community, while ensuring the orderly consideration and prompt disposition of petitions for involuntary confinement. In this context, the Montana Legislature has determined that counsel cannot be waived. Section 53-21-119(1), MCA.

¶26 The core of due process "emphasizes fairness between the State and the individual dealing with the State." *Evitts v. Lucey*, 469 U.S. 387, 405, 105 S. Ct. 830, 841 (1985) (internal quotations omitted). This means that concerns about fairness, integrity, and accuracy of the process carry great weight. And especially so in civil commitment proceedings. The State has no interest in involuntarily committing people who do not suffer from a mental disorder that makes them a danger to themselves or others under the statutory criteria of § 53-21-126(1)(a)-(d), MCA. Thus, the State has an important interest in seeing that proceedings lead to fair and accurate outcomes. The United States Supreme Court acknowledged in *Martinez* that "[n]o one . . . attempts to argue that as a rule *pro se* representation is wise, desirable or efficient." *Martinez*, 528 U.S. at 161, 120 S. Ct. at 691. There is a very real risk that self-representation in civil commitment proceedings would increase the likelihood of an unfair or erroneous result rather than enhancing the fairness or accuracy of the proceeding.

¶27 The United States Supreme Court noted in *Indiana v. Edwards*, 554 U.S. 164, 175, 128 S. Ct. 2379, 2386 (2008), that "[m]ental illness itself is not a unitary concept. It varies in degree. It can vary over time. It interferes with an individual's functioning at different times in different ways." If the United States Constitution guaranteed self-representation in civil commitment proceedings, courts would have to reassess throughout the proceeding whether the person before them was competent to waive counsel. As the Supreme Court of Vermont pointed out, self-representation in involuntary commitment proceedings "creates a circularity problem." *In re G.G.*, 165 A.3d at 1090. It is quite possible that a

15

person in a civil commitment proceeding who proceeded pro se and was found in need of commitment "would then be in a position to challenge the initial waiver of counsel as not knowing, intelligent or voluntary[,] and thereby [claim] a right to a new hearing with counsel." *In re G.G.*, 165 A.3d at 1090. Such potential disruptions not only implicate the state interest in expedient resolution of cases, but also delay getting the respondent any treatment and care he or she needs.

¶28 The forgoing discussion demonstrates that the Legislature has taken extensive measures to preserve the integrity of the process and to uphold the interests of persons involved. Prohibiting the waiver of counsel is one such measure. Our examination reveals that a right to self-representation in civil commitment proceedings is neither "deeply rooted in our Nation's history," nor "implicit in the concept of ordered liberty." *Glucksberg*, 521 U.S. at 721, 117 S. Ct. at 2268 (citations and internal quotations omitted). The Due Process Clause, therefore, does not establish as fundamental the right to represent oneself in civil commitment proceedings.

¶29 Because a fundamental right is not implicated in this case, the United States Constitution requires only that the statute "be rationally related to legitimate government interests." *See Glucksberg*, 521 U.S. at 728, 117 S. Ct. at 2271; *see also Mont. Cannabis Indus. Ass'n*, ¶ 21 ("Where a fundamental right is not implicated, '[s]ubstantive due process analysis requires a test of the reasonableness of a statute in relation to the State's power to enact legislation.'" (quoting *Satterlee v. Lumberman's Mut. Cas. Co.*, 2009 MT 368, ¶ 33, 353 Mont. 265, 222 P.3d 566)).

16

¶30 Evident from the above discussion is the State's substantial interest in preserving the integrity and fairness of civil commitment proceedings. Because the statute is based on the sound public policy that persons in civil commitment proceedings should be represented by counsel to preserve fairness, integrity, and accuracy in the civil commitment process, the prohibition against waiver is "reasonably related to a permissible legislative objective." *Mont. Cannabis Indus. Ass'n*, ¶ 21. The challenged language in § 53-21-119(1), MCA, has a "plainly legitimate sweep," and so S.M.'s facial challenge must fail. *Wash. State Grange*, 522 U.S. at 449, 128 S. Ct. at 1190 (citations and internal quotations omitted).

¶31 Although the United States Constitution does not require courts to allow persons in civil commitment proceedings to represent themselves, we do not minimize the important autonomy interests a respondent has relating to "the inestimable worth of free choice" and "respect for the individual." *Faretta*, 422 U.S. at 834, 95 S. Ct. at 2540-41 (citations and internal quotations omitted). Even though respondents cannot waive counsel under § 53-21-119(1), MCA, this does not mean that they cannot participate extensively in the proceedings as appropriate, which S.M. did. The statute guarantees certain procedural safeguards, including the right to be present and to offer evidence, among other rights. Section 53-21-115(2), MCA. These rights to be present and to offer evidence mean that a respondent may offer his or her perspective to the court, explain why he or she should not be committed, or explain why a less restrictive placement is proper under the circumstances.

17

¶32 S.M. did just this. In the initial hearing, S.M. requested the court to move him within the facility at which he was being held to the side where he could go outside, stating, "I have not been disruptive. I have been cooperative and I'm pretty much coherent." S.M. participated extensively in the proceedings at the next hearing. He made arguments in support of his federal rights before the court and he made the decision to meet with both his counsel and the prosecutor to negotiate a stipulation. Although he could not waive counsel entirely, S.M. was able to participate in such a manner that protected his personal autonomy under the circumstances.

¶33 Our prior interpretations of § 53-21-119(1), MCA, support this outcome. In *In re N.A.*, ¶ 10, the respondent's counsel "assisted in cross examination, conducted direct examination of [the respondent], and addressed the District Court concerning matters of legal significance," but the respondent performed a majority of the cross-examinations and delivered a closing argument. We held that the respondent's participation did not reduce counsel to standby counsel and did not make counsel's performance ineffective. *In re N.A.*, ¶¶ 17, 38. Such extensive participation was appropriate under the circumstances of that case, just as S.M.'s extensive participation was appropriate under the circumstances of this case. The appropriate level of participation in each case will depend on the circumstances and the individual capacity of the respondent in the civil commitment proceeding. Judges should allow such participation, when appropriate, to promote the respondent's individual autonomy and dignity, so long as such participation protects the respondent's statutory rights and will not prevent the fair, orderly, and accurate administration of the proceeding.

¶34 We also note that Montana Rule of Professional Conduct 1.14(a) states that "[w]hen a client's capacity to make adequately considered decisions in connection with a representation is diminished, whether because of minority, mental impairment or for some other reason, the lawyer shall, as far as reasonably possible, maintain a normal client-lawyer relationship with the client." Part of a normal attorney-client relationship includes "reasonably consult[ing] with the client about the means by which the client's objectives are to be accomplished," M. R. Prof. Cond. 1.4(a)(2), and "abid[ing] by a client's decisions concerning the objectives of representation," M. R. Prof. Cond. 1.2(a). These rules highlight that when an attorney represents a client during a civil commitment proceeding, the attorney has an ethical duty to seek the client's input and, if the client so chooses, to allow for the client's participation in the defense "as far as reasonably possible." M. R. Prof. Cond. 1.14(a).

¶35 Section 53-21-119(1), MCA, as interpreted by this Court, thus does not raise any due process concerns. Although the statute requires counsel, a respondent in a civil commitment proceeding still has a right to participate personally in the proceeding and, depending on the respondent's circumstances and capacity, to participate extensively.

## CONCLUSION

¶36 We affirm the District Court's order of commitment and uphold the constitutionality of § 53-21-119(1), MCA. The judgment is affirmed.

/S/ BETH BAKER

19

We concur:

/S/ LAURIE McKINNON
/S/ MICHAEL E WHEAT
/S/ MIKE McGRATH
/S/ DIRK M. SANDEFUR
/S/ JAMES JEREMIAH SHEA
/S/ JIM RICE